JJV,JURY

# U.S. District Court
## Eastern District of Arkansas (Little Rock)
## CIVIL DOCKET FOR CASE #: 4:18–cv–00770–BSM

Alcoa Community Federal Credit Union v. Sonic Corporation et al
Assigned to: Chief Judge Brian S. Miller
Cause: 28:1332 Diversity–Property Damage

Date Filed: 10/16/2018
Jury Demand: Plaintiff
Nature of Suit: 380 Personal Property: Other
Jurisdiction: Diversity

**Plaintiff**

**Alcoa Community Federal Credit Union**
*individually and on behalf of all others similarly situated*

represented by **Karen Sharp Halbert**
Roberts Law Firm, P.A.
Post Office Box 241790
Little Rock, AR 72223–1790
501–821–5575
Fax: 501–821–4474
Email: karenhalbert@robertslawfirm.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael L. Roberts**
Roberts Law Firm, P.A.
Post Office Box 241790
Little Rock, AR 72223–1790
501–821–5575
Email: mikeroberts@robertslawfirm.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephanie Egner Smith**
Roberts Law Firm, P.A.
Post Office Box 241790
Little Rock, AR 72223–1790
501–821–5575
Email: stephanieegner@robertslawfirm.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Sonic Corporation**

**Defendant**

**Sonic Industries Services Inc**

**Defendant**

**Sonic Capital LLC**

**Defendant**

**Sonic Franchising LLC**

**Defendant**

**Sonic Industries LLC**

**Defendant**

**Sonic Restaurants Inc**

| Date Filed | # | Docket Text |
|---|---|---|
| 10/16/2018 | [1](#) | COMPLAINT–CLASS ACTION with Jury Demand filed by Alcoa Community Federal Credit Union against All Defendants. Fee $400. Receipt Number LIT069247. Summons issued and returned to counsel for service. (Attachments: # [1](#) Civil Cover Sheet)(cmn) (Entered: 10/16/2018) |
| 01/04/2019 | [2](#) | NOTICE by Alcoa Community Federal Credit Union *Regarding Waiver of the Service of Summons* (Halbert, Karen) (Entered: 01/04/2019) |
| 02/12/2019 | [3](#) | WAIVER OF SERVICE Returned Executed as to All Defendants by Alcoa Community Federal Credit Union. (Smith, Stephanie) (Entered: 02/12/2019) |

**FILED**
U. S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

OCT 1 6 2018

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**

|  |  |  |
|---|---|---|
| ALCOA COMMUNITY FEDERAL CREDIT UNION, individually and on behalf of all others similarly situated, | : | Case No. 4:18-cv-770-BSM |
|  | : |  |
| Plaintiff, | : |  |
| v. | : |  |
|  | : | **COMPLAINT – CLASS ACTION** |
| SONIC CORPORATION, SONIC INDUSTRIES, SERVICES INC., SONIC CAPITAL LLC, SONIC FRANCHISING LLC, SONIC INDUSTRIES LLC, SONIC RESTAURANTS, INC. | : | DEMAND FOR JURY TRIAL |
|  | : | This case assigned to District Judge Miller |
|  | : | and to Magistrate Judge Volpe |
| Defendants. | : |  |

## COMPLAINT – CLASS ACTION

Plaintiff Alcoa Community Federal Credit Union ("Alcoa Credit Union" or "Plaintiff"), on behalf of itself and all others similarly situated, alleges the following against Defendants Sonic Corporation, Sonic Industries Services, Inc., Sonic Capital LLC, Sonic Franchising LLC, Sonic Industries LLC, Sonic Restaurants, Inc. (referred to herein as "Sonic" or "Sonic Defendants"), based upon personal knowledge where applicable, information and belief, and the investigation of counsel.

### I.   INTRODUCTION

1.     Plaintiff brings this class action on behalf of financial institutions that suffered, and continue to suffer, property damage and financial losses as a result of Sonic's implementation of inadequate measures to protect Plaintiff's and other financial institutions' payment card data from being stolen from Sonic's point-of-sale ("POS") and computer systems.

1

In 2017, Sonic allowed a computer hacker to enter Sonic's computer system undetected and install malware that infected POS systems at more than 300 of Sonic's U.S. restaurants in 32 states (the "Data Breach"). The malware enabled the hacker to steal the cardholder names, credit and debit card numbers, card expiration dates, card verification values, service codes, and other information (collectively, "Payment Card Data") of customers using payment cards issued by Plaintiff and the Class (defined below). The stolen Payment Card Data was then sold by the hacker and used by cyber-criminals to make fraudulent purchases.

2.      This confidential Payment Card Data, which is owned by and is the property of Plaintiff and the Class, was compromised and rendered useless because of Sonic's affirmative acts in implementing data security measures that were inadequate to properly protect the Payment Card Data that Plaintiff and the Class entrusted to Sonic. Sonic, by accepting payment cards at its restaurants, knew or should have known it was required to adequately protect Payment Card Data.

3.      The susceptibility of POS systems to malware is well known throughout the retail and restaurant industries. In the last five years, malware placed on POS systems caused practically every major data breach involving retail stores or fast-food chains, resulting in millions of compromised payment cards.

4.      It is well known that Payment Card Data is valuable and often targeted by hackers. Over the last several years, numerous data breaches have occurred at large retailers  and restaurants nationwide, including Home Depot, Target, KMART, P.F. Chang's,

Wendy's, Chipotle and many others. Javelin Strategy and Research reports that identity thieves have stolen $112 billion in the past six years.[1]

5.      Due to the susceptibility of POS systems to hacking, a data breach that compromises sensitive payment card information is not an inevitability of doing business; rather, numerous measures can be taken to prevent intrusion by unauthorized personnel into POS devices and networks and to limit the effect of an intrusion if it occurs. For example, one data security expert recommends a "Tripod of POS Security," comprised of the following protective measures: (1) POS systems that support EMV chip-based payment cards (a highly secure method of transmitting credit card data that replaces the traditional magnetic stripe); (2) end-to-end encryption, which encrypts Payment Card Data as soon as payment cards are swiped; and (3) tokenization, which replaces credit and debit card numbers with a meaningless series of letters and numbers, rendering any information collected by hackers useless.[2]

6.      Despite the well-publicized and ever-growing threat of cyber-attacks targeting Payment Card Data through vulnerable POS systems and inadequately protected computer networks, Sonic took inadequate measures to prevent or detect the Data Breach, as the hacker launched its malicious payloads and ultimately exfiltrated Payment Card Data from Sonic's computer network. Sonic knowingly refused to implement certain best practices, understaffed its IT department, chose not to upgrade critical security systems, used an outdated POS system that no longer was supported by the hardware and software manufacturers, ignored explicit warnings

---

[1] *See* https://www.javelinstrategy.com/coverage-area/2016-identity-fraud-fraud-hits-inflection-point (last visited October 15, 2018).

[2] Point of sale security: Retail data breaches at a glance, DATACAP SYSTEMS, INC. (May 12, 2016), https://www.datacapsystems.com/blog/point-of-sale-security-retail-data-breaches-at-a-glance#.

about the vulnerability of its POS system, and disregarded and/or violated applicable industry standards.

7.      Plaintiff and the Class have suffered property damage – *i.e.*, the complete and immediate obsolescence of their computer data associated with the compromised payment cards – and other financial losses as a result of the Data Breach. Specifically, Plaintiff and other financial institutions have been forced to: (a) replace the computer data rendered useless by the Data Breach; (b) cancel or reissue any credit and debit cards affected by the Data Breach; (c) close any deposit, transaction, checking, or other accounts affected by the Data Breach, including, but not limited to, stopping payments or blocking transactions with respect to the accounts; (d) refund any cardholder for any unauthorized transaction relating to the Data Breach; (e) respond to a higher volume of cardholder complaints, confusion, and concern; and (f) increase fraud monitoring efforts.

8.      This class action is brought on behalf of financial institutions throughout the U.S. to recover the damages that they and others similarly situated have suffered, and continue to suffer, as a direct result of the Data Breach. Plaintiff asserts claims for negligence, negligence *per se*, violation of the Arkansas Deceptive Trade Practices Act, misappropriation of trade secrets in violation of the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1831, *et seq.*, and declaratory and ancillary equitable relief.

## II.      PARTIES

### A. Plaintiff

9.      Plaintiff Alcoa Community Federal Credit Union ("Plaintiff Alcoa") is a credit union headquartered at 1125 Military Rd., Benton, Arkansas 72015. Plaintiff received a

Compromised Account Management System or CAMS alert regarding the Sonic Data Breach. Plaintiff Alcoa employs numerous methods to maintain the confidentiality of its Payment Card Data and to prevent disclosure of its Payment Card Data to unauthorized third parties. As a result of the Sonic Data Breach, Plaintiff Alcoa has suffered, and continues to suffer, injuries, including, *inter alia*, property damage to the computer data associated with the Payment Card Data rendered useless as a result of the Data Breach, as well as costs to: (a) replace the computer data rendered useless by the Data Breach; (b) cancel or reissue any payment cards affected by the Data Breach; (c) close any deposit, transaction, checking, or other accounts affected by the Data Breach, including, but not limited to, stopping payments or blocking transactions with respect to the accounts; (d) refund any cardholder for any unauthorized transaction relating to the Data Breach; (e) respond to a higher volume of cardholder complaints, confusion, and concern; and (f) increase fraud monitoring efforts. Plaintiff Alcoa, thus, has suffered injury in Arkansas.

**B. Defendants**

10. Defendant Sonic Corporation ("Sonic") is a Delaware corporation with its headquarters and principal place of business located at 300 Johnny Bench Drive, Oklahoma City, Oklahoma 73104. Sonic operates the largest chain of drive-in restaurants, Sonic Drive-Ins, in the United States.

11. Sonic Corporation, through its subsidiaries, operates and franchises the largest chain of drive-in restaurants ("Sonic Drive-Ins") in the United States. For the fiscal year ended August 31, 2017, Sonic generated $63.7 million in net income. *See* Sonic Corp. Annual Report (Form 10-K), (filed 10/27/2017 with SEC).

12. When Sonic refers to "Sonic Corp.," "Sonic," "the Company," "we," "us" and

"our" in its SEC filings and annual reports, it is referring to Sonic Corporation and its subsidiaries. *Id.*

13.     As of August 31, 2017, the Sonic system was comprised of 3,593 drive-ins, of which 6% were Company Drive-Ins and 94% were Franchise Drive-Ins. *Id.*

14.     As set forth herein, all decisions relating to data security were made from Sonic's corporate headquarters in Oklahoma City, Oklahoma.

15.     By sales, Sonic is the twelfth largest restaurant chain in America. https://www.si.com/eats/2017/06/30/top-25-restaurant-chains-america-sales (last visited 10/15/18). It is the fourth largest quick service burger restaurant chain. https://www.qsrmagazine.com/reports/qsr50-2016-burger-segment-breakdown (last visited 10/15/18).

16.     Defendant Sonic Industries Services, Inc. is an Oklahoma corporation with its headquarters and principal place of business in Oklahoma City, Oklahoma. It is a subsidiary of Sonic Corp.

17.     Defendant Sonic Capital LLC is Delaware limited liability company with its headquarters and principal place of business in Oklahoma City, Oklahoma. It is a subsidiary of Sonic Industries Services, Inc.

18.     Defendant Sonic Franchising LLC is a Delaware limited liability company with its headquarters and principal place of business in Oklahoma City, Oklahoma. Sonic Franchising LLC franchises restaurants. It is a subsidiary of Sonic Capital LLC.

19.     Defendant Sonic Industries LLC is a Delaware limited liability company with its headquarters and principal place of business in Oklahoma City, Oklahoma. Sonic Industries,

LLC is a franchise assets holder. It is a subsidiary of Sonic Capital LLC.

20.     Defendant Sonic Restaurants, Inc. is an Oklahoma corporation with its headquarters and principal place of business in Oklahoma City, Oklahoma. Sonic Restaurants, Inc. operates restaurants. It is a subsidiary of Sonic Corp.

### III.     JURISDICTION AND VENUE

21.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from one defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

22.     This Court also has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff asserts a claim under the DTSA, 18 U.S.C. § 1832. The Court also has supplemental or pendant jurisdiction over Plaintiff's remaining claims insofar as those claims form part of the same case or controversy as the federal question claim, pursuant to 28 U.S.C. § 1367.

23.     Further, the Plaintiff has its principal place of business in this District and is headquartered in this District, and Defendant conducts substantial business in this District.

24.     Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this district and Defendant has caused harm to Class members residing in this district.

# IV. FACTUAL ALLEGATIONS

A. **Sonic Had a Common Law Duty to Protect Payment Card Data in Light of the Foreseeability of the Risk It Created by Knowingly Implementing Inadequate Data Security Measures**

25.     Plaintiff and the Class are financial institutions that issue payment cards, such as credit and debit cards, to their customers.

26.     A POS system is an on-site device that manages both cash and payment card transactions from consumer purchases. When a payment card is used at a POS terminal, "data contained in the card's magnetic stripe is read and then passed through a variety of systems and networks before reaching the retailer's payment processor."[3] Before transmitting customer data over the merchant's network, POS systems typically, and very briefly, store the data in plain text within the system's memory.[4] Any time that Payment Card Data is "in the clear"—that is, in plain text format that is readable by a person or computer—it is extremely vulnerable to theft. It is this unencrypted Payment Card Data on the POS system that hackers seek to access.

27.     It is well known that Payment Card Data has considerable value to and often is targeted by hackers, who easily can sell Payment Card Data, as a result of the "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[5] Tim Erlin, Vice President of Tripwire, a threat, security and compliance

---

[3] *A Special Report on Attacks on point-of-sales systems* at 6, Symantec (Nov. 20, 2014), https://www.symantec.com/content/dam/symantec/docs/white-papers/attacks-on-point-of-sale-systems-en.pdf.

[4] *Id.* at 5.

[5] Brian Krebs, *The Value of a Hacked Company*, KREBS ON SECURITY (July 14, 2016, 10:47 AM), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.

8

solutions vendor, noted that "[a]s long as compromised credit card data continues to be a valuable commodity on the black market, any company collecting or processing valid credit card information will continue to be a high value target."[6] Intruders with access to Payment Card Data can physically replicate the card or use it online. Unsurprisingly, theft of payment card information via POS systems is now "one of the biggest sources of stolen payment cards."[7]

28.     As noted above, numerous data breaches have occurred at large retailers and restaurants nationwide, including Arby's, Wendy's, Target, Home Depot, Sally Beauty, Harbor Freight Tools, P.F. Chang's, Dairy Queen, Kmart, Chipotle, and many others.

29.     Each of these massive data breaches involved malware placed on each merchant's POS system. For example, in 2013, hackers infiltrated Target's POS system, stealing information from an estimated 40 million payment cards in the United States.[8] In 2014, over 7,500 self-checkout POS terminals at Home Depot locations throughout the United States were hacked, compromising roughly 56 million debit and credit cards.[9] In 2016, on-site POS systems at more than 1,000 Wendy's restaurants were infiltrated with malware, resulting in the theft of Payment Card Data for nearly six months.[10]

---

[6] Dan Rayward, *Sonic Reports Suspicious Activity on POS System*, INFOSECURITY MAGAZINE (Apr. 26, 2017), https://www.infosecurity-magazine.com/news/Sonic-suspicious-activity-pos/.

[7] *A Special Report*, *supra* n.3.

[8] Brett Hawkins, *Case Study: The Home Depot Data Breach* at 3-4, SANS INSTITUTE (Jan. 2015), https://www.sans.org/reading-room/whitepapers/casestudies/casestudy-home-depot-data-breach-36367.

[9] *Id.* at 4, 7.

[10] Brian Krebs, *1,025 Wendy's Locations Hit in Card Breach*, KREBSONSECURITY (July 8,

30.     Despite the well-known vulnerabilities of POS systems, available security measures and business practices would have significantly reduced or eliminated hackers' ability to successfully infiltrate merchants' POS systems. One report indicated that over 90% of the data breaches occurring in 2014 were preventable.[11]

31.     As discussed fully below, the payment card networks (MasterCard, Visa, Discover, and American Express), data security organizations, federal agencies, and state governments have implemented recommended standards of care regarding security measures designed to prevent these types of intrusions into POS systems. Sonic's adherence to reasonable standards of care could have either prevented or timely detected this Data Breach.

32.     Sonic is, and at all relevant times has been, aware that the Payment Card Data it receives and maintains is confidential and highly sensitive and could be used for nefarious purposes by third parties, such as perpetrating identity theft and making fraudulent purchases.

33.     Sonic is, and at all relevant times was, fully aware of the significant volume of daily payment card transactions at Sonic's restaurants, amounting to tens of thousands of daily payment card transactions, and thus, the significant number of payment cards that would be impacted by a breach of Sonic's POS systems.

34.     Sonic is, and at all relevant times has been, aware of the importance of safeguarding Payment Card Data and of the foreseeable consequences that would occur if its data security systems were breached, including the significant harm that Plaintiff and the Class would

---

2016), https://krebsonsecurity.com/2016/07/1025-wendys-locations-hit-in-card-breach/.

[11] *2016 Data Breach Investigations Report* at 1, VERIZON (Apr. 2016), http://www.verizonenterprise.com/resources/reports/rp_2016-DBIR-Retail-Data-Security_en_xg.pdf.

suffer.

35.     Despite that Sonic understood the risk that it created in leaving its POS systems vulnerable to a malware attack, Sonic took unreasonable and insufficient measures to protect Payment Card Data by choosing not to employ widely available resources to prevent or detect an intrusion.

**B.  The Sonic Data Breach**

36.     On September 26, 2017, journalist Bryan Krebs ("Krebs") made the first public report that hackers had gained access to Sonic's computer and point-of-sale systems and that a database of Sonic's customers' bank cards had been on sale since September 15, 2017.[12] Krebs noted that he first began hearing of a potential data breach when sources at multiple financial institutions noticed a pattern of fraudulent transactions on cards used at Sonic.

37.     According to Sonic's public statements, it was made aware of "unusual activity" on payment cards used at Sonic by its payment card processor the week before.[13]

38.     A cybercrime marketplace called "Joker's Stash" had been selling the bank card information under the batch name FireTigerrr since September 18, 2017.  Joker's Stash sold the stolen credit and debit card information for $25-$50 and was advertised as "100% fresh." In addition, Joker's Stash indexed the cards based on city, state and ZIP code, making it easier for purchasers to acquire cards from their area and the fraudulent use more difficult to detect. As reported by Krebs,

---

[12] *See* https://krebsonsecurity.com/2017/09/breach-at-sonic-drive-in-may-have-impacted-millions-of-credit-debit-cards/.

[13] *See, e.g.* "Sonic Drive-In hit by security breach" USA Today, 09/27/17, at https://www.usatoday.com/story/tech/2017/09/27/sonic-drive-hit-security-breach/708850001/.

[t]he accounts apparently stolen from Sonic are part of a batch of cards that Joker's Stash is calling "Firetigerrr," and they are indexed by city, state and ZIP code. This geographic specificity allows potential buyers to purchase only cards that were stolen from Sonic customers who live near them, thus avoiding a common anti-fraud defense in which a financial institution might block out-of-state transactions from a known compromised card.

Malicious hackers typically steal credit card data from organizations that accept cards by hacking into point-of-sale systems remotely and seeding those systems with malicious software that can copy account data stored on a card's magnetic stripe. Thieves can use that data to clone the cards and then use the counterfeits to buy high-priced merchandise from electronics stores and big box retailers.

Prices for the cards advertised in the Firetigerr batch are somewhat higher than for cards stolen in other breaches, likely because this batch is extremely fresh and unlikely to have been canceled by card-issuing banks yet.

Most of the cards range in price from $25 to $50, and the price is influenced by a number of factors, including: the type of card issued (Amex, Visa, MasterCard, etc); the card's level (classic, standard, signature, platinum, etc.); whether the card is debit or credit; and the issuing bank.

39.     After Krebs contacted Sonic regarding the data breach, Krebs reported that it received the following statement from Sonic,

[o]ur credit card processor informed us last week of unusual activity regarding credit cards used at SONIC … The security of our guests' information is very important to SONIC. We are working to understand the nature and scope of this issue, as we know how important this is to our guests. We immediately engaged third-party forensic experts and law enforcement when we heard from our processor. While law enforcement limits the information we can share, we will communicate additional information as we are able.

40.     On October 4, 2017, Sonic publicly confirmed that it was the victim of a data breach and offered customers identity theft protection.  Sonic reported that credit and debit card numbers may have been acquired as part of a malware attack at some Sonic locations. Malware has been the culprit of many high-profile data breaches.  Malware infiltrates point-of-sale systems to steal clear-text cardholder data to be sold later on the black market.

12

41.     Sonic has made no effort to notify the individuals, such as the customers of Plaintiff and Class members, whose data was stolen, leaving those individuals to guess as to whether they are impacted and need to take measures to protect themselves from fraud. Indeed, for most customers, the first indication they had that they were impacted by the Sonic breach was seeing a fraudulent charge to their account.

42.     At each of its Drive-In locations, Sonic displays the logo of the major card brands– Visa, Mastercard, American Express, Discover – that it accepts. Customers relied on such signs in choosing to shop Sonic and to pay for their purchases with a payment card with the understanding that Sonic followed reasonable, industry standard practices for the protection of the transaction and Payment Card Data.

43.     More than five (5) months after news of the Sonic Data Breach had been broken, Sonic announced that the "investigations to date" had found "forensic evidence" that Payment Card Data was stolen from 314 Sonic Drive-In locations in 32 states.[14]

44.     As shown below, Joker's Stash boasted that the number of Sonic locations affected were in "ALMOST ALL USA STATES."[15]

---

[14] https://www.sonicdrivein.com/-/notice-of-data-breach-faq.

[15] *See* https://krebsonsecurity.com/2017/09/breach-at-sonic-drive-in-may-have-impacted-millions-of-credit-debit-cards/.

2017-09-26
**FIRETIGERRR BREACH UPDATE**



**FIRETIGERRR** BREACH at JOKER's STASH
**5.000.000 pcs. ALMOST ALL USA STATES.**
100% FRESH 100% FIRE DUMPS

**WARRAX** (FIRETIGERRR BREACH) **USA by STATE/CITY/ZIP TR1+TR2/TR2.** uploaded 2017-09-25
first 3 days NO REFUNDS '
after 3 days TIME FOR REFUNDS: 3 HOURS (GOLD USERS 12H, SILVER 9H, BRONZE 6H)

**WARRAX-EXTRA** (FIRETIGERRR BREACH) **USA by STATE/CITY/ZIP TR1+TR2/TR2.** uploaded 2017-09-25
first 3 days NO REFUNDS '
after 3 days TIME FOR REFUNDS: 3 HOURS (GOLD USERS 12H, SILVER 9H, BRONZE 6H)

FIRETIGERRR random dumps valid test (try2services checker):

* Joker's Stash     × / Try2Check.me | Gate 1     × ➕

🔒    try2services.pm

| | | | | | |
|---|---|---|---|---|---|
| | 18101010 | [00] | APPROVAL | 4.41 | processing void |
| | 20022011 | [00] | APPROVAL | 3.47 | processing void |
| | 18702010 | [00] | APPROVAL | 4.71 | processing void |
| | 20062019 | [00] | APPROVAL | 7.09 | processing void |
| | 20042011 | [00] | APPROVAL | 4.00 | processing void |
| | 20062010 | [00] | APPROVAL | 7.12 | processing void |
| 43510800 | 20052010 | [10] | PARTIAL APPROVAL | 9.12 | processing void |
| | 20122019 | [00] | APPROVAL | 4.47 | processing void |
| | 20212014 | [00] | APPROVAL | 1.70 | processing void |

45.     Sonic had the resources to prevent a breach, but was negligent in failing to secure Payment Card Data.  According to Sonic's 10-K for fiscal year ending August 31, 2017,[16]

> Sonic Drive-Ins are equipped with information technology systems including point-of-sale systems and operational tools for sales, labor and inventory. This technology includes industry-specific, off-the-shelf systems as well as proprietary software that assist in managing food and beverage costs. These solutions are integrated with our point-of-sale systems to provide information that is important for managers to run efficient and effective operations. We have centralized financial and accounting systems for Company Drive-Ins. We also have systems that receive transaction-level data from Franchise Drive-Ins. We believe these systems are important in analyzing and improving sales and profit margins and

---

[16] *See* Form 10-K, Sonic Corp., filed 10/27/17 for the Period Ending 08/31/17, available at http://files.shareholder.com/downloads/SONC/5577284129x0xS868611-17-50/868611/filing.pdf.

accumulating marketing information. We are also making strategic investments in customer facing digital technologies, including interactive menu boards, a multi-functional mobile application and electronic payment at the stall to enhance the customer's experience and drive sales. We have further invested in new point-of-sale systems. Our license agreements require a technology contribution of approximately .25% of sales to the Brand Technology Fund ("BTF"), which was established in the third quarter of fiscal year 2016 and administers cybersecurity and other technology programs for the Sonic system.

46.     Despite warnings from its payment card processor, First Data[17], and a number of high profile data breaches at other restaurant chains[18] in the years leading up to the Sonic Data Breach, which put Sonic on notice of the need to be vigilant against and take steps to prevent cyber attackers from stealing customers' data, Sonic's failed to take reasonable, industry-standard steps to secure its systems and its customers' data.

47.     In fact, in the years leading up to the Sonic Data Breach, Sonic management received numerous warnings about vulnerabilities in its systems and processes that put customer data at risk. Still, Sonic continued to use old, out-of-date hardware and software that was unsupported and unsecure. Sonic failed to follow even basic security precautions. In fact, after news of the Sonic Data Breach broke, one person commented, anonymously:

> "Antiquated Software caused Breach… Executives too focused on delivering unnecessary shiny 'new apps' instead of fixing a problem they were all aware of, end result – millions of customers impacted…"[19]

---

[17] In a pamphlet, First Data warns: "***Data is extremely vulnerable and you are completely responsible for protecting it***." "Payment Card Data Breaches: What You Need to Know About Your Risk and Liability," First Data Market Insight, at https://www firstdata.com/downloads/thought-leadership/13405 0714 Payment Card Data Breach.pdf

[18] *See e.g.* "7 Way to Protect Against a Data Breach," QSR Magazine, Feb. 2016, at https://www.qsrmagazine.com/restaurant-software/7-ways-protect-against-data-breach.

[19] https://www.thelayoff.com/sonic

48. Sonic, including its Board of Directors, were aware for years prior to the Sonic Data Breach that retailers, including restaurants like them, were prime targets for cyber attackers looking to steal valuable credit card data.

49. Sonic was negligent and failed to implement current, basic industry-accepted data security tools to prevent cyber attackers from accessing the cardholder data environment ("CDE"). Sonic failed to utilize point-to-point encryption on all POS terminals. If Sonic had not been negligent and taken even one of these basic security steps, the cyber attackers would not have been able to access or use customers' Payment Card Data or would have been detected at a much earlier date, reducing the number of customers whose Payment Card Data was compromised.

50. Sonic neglected to timely and adequately invest in data security, despite the growing number of well-publicized data breaches. Had Sonic remedied the deficiencies in its data security systems, followed security guidelines, and adopted security measures recommended by experts in the field, Sonic would have prevented the Data Breach.[20]

51. The Sonic Defendants did have some monitoring systems turned on, and those systems sent out alerts when the cyber attackers entered various parts of their computer systems but Sonic either failed to review many of these alerts, or ignored the alerts. As time went on, the cyber attackers were stealing so much data (*i.e.*, Payment Card Data) that basic information technology maintenance systems should have recognized and stopped the attack. Unfortunately, Sonic failed to properly implement or monitor those systems.

---

[20] *See* "From IHG to Sonic: Hospitality Remains Slow to Adopt Greater Credit Card Security Measures," Hospitality Technology (Oct. 12, 2017), available at https://hospitalitytech.com/ihg-sonic-hospitality-remains-slow-adopt-greater-credit-card-security-measures.

52.     Taking advantage of Sonic's lax data security, hackers were able to gather large amounts of Payment Card Data.  With that data, unknown perpetrators were able to make hundreds of thousands or even millions of fraudulent undetected purchases on credit and debit cards that had been issued by Plaintiff and members of the Class.

53.     Sonic's data security systems suffered from many deficiencies that made them susceptible to hackers. Among other things, Sonic knowingly:

      a.  ignored well-known data security risks, thereby intentionally allowing data security deficiencies to persist;

      b.  lacked adequate firewall protection and proper network segmentation, which would have prevented hackers from accessing Payment Card Data;

      c.  refused to implement certain protocols that would have prevented unauthorized programs, such as malware, from being installed on its POS and other systems that accessed Payment Card Data and otherwise would have protected Payment Card Data; and

      d.  failed to install software to adequately track access to its network, monitor the network for unusual activity, and prevent exfiltration of data, which would have detected the presence of the hacker and prevented Payment Card Data from being stolen.

**C. Sonic Breached Its Duty to Avoid Causing Plaintiff and the Class Foreseeable Harm by Consciously Disregarding Known Risks**

    **1.  Despite Well-Known Risks, Sonic's Lackadaisical Approach to data Security Allowed Deficiencies to Persist**

54.     Much of the blame for the state of Sonic's data security systems can be placed

17

squarely on the shoulders of Sonic's senior management, who knowingly failed to upgrade POS hardware and software and failed to maintain a system of accountability over data security.

55.     Sonic also was aware of the threat of a data breach given the prior high-profile breaches that occurred at Target, Home Depot, Wendy's, and others. As early as October 2008, Visa issued a Data Security Alert describing the threat of RAM scraping malware.[21] In May 2009, Visa issued an updated Data Security Alert warning merchants that due to a memory parsing (RAM scraping) vulnerability "hackers are gaining unauthorized access to point-of-sale (POS) environments as a result of insecure remote desktop solutions or poor network configuration."[22] The May 2009 alert instructs companies to "secure their external and internal network perimeters to prevent unauthorized access to POS systems, payment processing servers, database servers or other servers where payment card data resides." *Id.* The May 2009 alert further instructs merchants to "secure your remote access connectivity," "implement a secure network configuration including egress and ingress filtering to only allow the ports/services necessary to conduct business" (i.e., segregate networks), "[m]onitor firewalls for suspicious traffic (particularly outbound traffic to unknown addresses)," "[i]mplement file integrity monitoring," "[s]ecure systems so that unauthorized software cannot be installed," "[e]nsure that all anti-virus and anti-spyware software programs are up-to-date," and "[r]outinely examine

---

[21] Numaan Huq, *2014 – An Explosion of Data Breaches and PoS RAM Scrapers*, Trend Micro: Trend Labs Security Intelligence Blog (Sept. 11, 2014, 2:16 AM), http://blog.trendmicro.com/trendlabs-security-intelligence/2014-an-explosion-of-data-breaches-and-pos-ram-scrapers/ (last accessed October 26, 2017).

[22] Visa Data Security Alert – *Targeted Hospitality Sector Vulnerabilities* (May 28, 2009), https://webcache.googleusercontent.com/search?q=cache:inr6SWDrgc8J:https://www.firstdata.com/downloads/partners/fd_gpm_notice_visa_security_alert_28may09_partnersupport.doc+&cd=8&hl=en&ct=clnk&gl=us.

systems and networks for newly-added hardware devices; unknown files and software." *Id.*

56.     Indeed, in August 2013, Visa warned merchants, including Sonic, of malware targeting POS systems. Specifically, the alert, entitled "Retail Merchants Targeted by Memory-Parsing Malware," warned: "Since January 2013, Visa has seen an increase in network intrusions involving retail merchants. Once inside the merchant's network, the hacker will install memory parser malware on the Windows based cash register system in each lane."[23]

57.     In February 2014, Visa again warned Sonic and other merchants of the increased risks posed by malware designed to target POS systems in an update to its August2013 security alert. Specifically, the February 2014 alert stated:

> Visa is issuing this alert to make clients aware of new malware information and to remind Visa merchants to secure their payment processing (and non-payment) networks from unauthorized access. Visa highly recommends merchants implement these signatures on security solutions to detect a suspected breach. However, Visa recommends performing sufficient due diligence prior to implementing any block to avoid any inadvertent connectivity issues for legitimate access.[24]

58.     In November 2015, Visa issued another security alert notifying Sonic and other merchants of additional malware infections targeting and impacting merchants and restaurants. This alert specifically stated that a restaurant group had been targeted by this form of malware attack and that "infections started in August 2015 but appeared to increase dramatically in the

---

[23] Visa Data Security Alert, *Retail Merchants Targeted by Memory-Parsing Malware - UPDATE* (August 2013), https://usa.visa.com/dam/VCOM/download/merchants/Bulletin__ Memory_Parser_Update_082013.pdf.

[24] Visa Data Security Alert, *Retail Merchants Targeted by Memory-Parsing Malware - UPDATE* (Feb. 2014), https://usa.visa.com/dam/VCOM/download/merchants/Bulletin-Memory- Parser-Update-012014.pdf.

middle of October 2015."[25]  The security alert further stated that "Windows XP and Windows 7 (both 32 bit and 64 bit) are the primary operating systems infected." *Id.*

59.  Defendant also received additional warnings regarding malware infiltration of POS systems from the U.S. Computer Emergency Readiness Team ("U.S. CERT"), a government unit within the Department of Homeland Security, which alerted retailers to the threat of POS malware in two separate alerts, on January 2, 2014 and on July 31, 2014, and issued a guide for retailers on protecting against the threat of POS malware.[26]

60.  Sonic knew or should have known of the susceptibility of its POS systems and that a breach of its corporate network would permit intruders to install malware at its locations throughout the U.S., putting Plaintiff's and the Class's Payment Card Data at risk.

61.  Sonic disregarded the potential danger of a data breach by failing to devote adequate resources to address security issues and failing to take adequate steps to implement reasonable data security measures to prevent or timely detect the Data Breach.

### 2. Sonic Lacked Adequate Firewall Protection and Appropriate Network Segmentation

62.   Sonic failed to maintain adequate firewall protection, which would have prevented its computer network from being breached by hackers. Indeed, Sonic should have been

---

[25] Security Alert, Visa, *Update - Cybercriminals Targeting Point Of Sale Integrators* (Nov. 13, 2015), https://usa.visa.com/dam/VCOM/download/merchants/alert-pos-integrators.pdf.

[26] *See* U.S. CERT, *Alert (TA14-002A): Malware Targeting Point of Sale Systems* (Jan. 2, 2014) (revised Oct. 6, 2016), https://www.us-cert.gov/ncas/alerts/TA14-002A; U.S. CERT, *Alert (TA14-212A): Backoff Point-of-Sale Malware* (July 31, 2014) (revised Sept. 30, 2016), www.us-cert.gov/ ncas/alerts/TA14-212A.

aware of the PCI DSS requirements and the significant risks associated with a deficient firewall and that such deficiencies could lead to a data breach.

63.     A firewall can prevent unauthorized access to, or from, a private network by screening out traffic from hackers, viruses, worms, or other types of malware specifically designed to compromise a POS system. U.S. CERT therefore recommends that firewalls should be used to protect POS systems from outside attacks.[27]

64.     Similarly, a Visa Data Security Alert, issued in February 2014, warned merchants, such as Sonic, that they should be vigilant with respect to their firewalls and firewall configuration. The February 2014 security alert informed merchants that they should:

> [r]eview your firewall configuration and ensure only allowed ports, services and IP (internet protocol) addresses are communicating with your network. This is especially critical on outbound (e.g., egress) firewall rules, where compromised entities allow ports to communicate to any IP on the Internet. Hackers will leverage this misconfiguration to exfiltrate data to their IP address.[28]

65.     Despite this, Sonic failed to take necessary measures to maintain an adequate firewall that was properly configured to prevent hackers from penetrating its computer network.

66.     In fact, the U.S. Department of Commerce's National Institute of Standards and Technology ("NIST") has published a *Guide to Application Whitelisting* for computer security. The purpose of NIST and its Information Technology Laboratory includes the development of management, administrative, technical, and physical standards and guidelines for the cost-effective security and privacy of other than national security-related information in federal information systems. NIST states that the use of whitelisting "helps to stop the execution of

---

[27] U.S. CERT, *Alert (TA14-002A), supra* n.21.

[28] Visa Data Security Alert (Feb. 2014), *supra* n.19.

malware, unlicensed software, and other unauthorized software."[29] NIST further recommends that "[o]rganizations should consider these technologies, particularly for centrally managed desktops, laptops, and servers, because of the relative ease in managing these solutions and the minimal additional cost. *Id.* at 5.

67.     Indeed, the NIST Guide states that "application whitelisting software prevents installation and/or execution of any application that is not specifically authorized for use on a particular host. This mitigates multiple categories of threats, including malware and other unauthorized software." *Id.* at 2.

68.     Sonic knew or should have known firewalls and network segmentation were necessary, but chose to not comply with these minimum standards of care.

### 3. Sonic Refused to Implement Protocols that Would Have Protected Payment Card Data

69.     Sonic failed to implement certain protocols that would have detected and prevented unauthorized programs from being installed on Sonic POS systems and otherwise would have protected Payment Card Data in the event of a data breach.

70.     Payment Card Data for a purchase transaction must flow through multiple systems and parties in order to be processed. For most merchants, there are two points in the payment process where sensitive cardholder data is at risk of being exposed or stolen because it exists "in the clear":

- Pre-authorization – When the merchant has captured the Payment Card Data and it is being sent or is waiting to be sent to the acquirer/processor.

---

[29] Adam Sedgewick, Murugiah Souppaya, and Karen Scarfone, *NIST Special Publication 800-167: Guide to Application Whitelisting* at 3, NIST (Oct. 2015), http://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-167.pdf.

- Post-authorization – When Payment Card Data has been sent back to the merchant with the authorization response from the acquirer/processor, and it is placed into some form of storage in the merchant environment and used for analytics and other back-office processes.

71.     First Data, the largest merchant acquirer, issuer processor, and independent network services provider in the world, recommends two highly effective technologies available to address these two specific points of vulnerability: encryption and tokenization.[30] "Encryption mitigates security weaknesses that exist when [Payment Card Data] has been captured but not yet authorized. Tokenization addresses security vulnerabilities after a transaction has been authorized."[31] As First Data explains:

> In the process of tokenization, once the transaction is authorized the payment data is sent to a centralized and highly secure server where it is stored. At the same time, a random unique number is generated and returned to the merchant's systems for use in place of the cardholder data. The token number—which cannot be monetized by anyone but the merchant that owns the token—can be used in subsequent post-authorization business processes. . . . If token numbers are breached, they are meaningless to data thieves because they are simply random numbers. *Id.*

72.     The National Restaurant Association has published certain information or best practices to protect restaurant networks from hacking. Specifically, the National Restaurant Association identified certain items within a restaurant's network that it should protect including

---

[30] *See* First Data Market Insight, Avoiding a Data Breach: An Introduction to Encryption and Tokenization, https://www.firstdata.com/en_ie/insights/6203-Data-Breach-Market- Insight.html; *see also* Point of Sale Security: Retail Data Breaches At a Glance, DATACAP SYSTEMS, INC. (May 12, 2016), https://www.datacapsystems.com/blog/point-of-sale-security- retail-data-breaches-at-a-glance#.

[31] First Data Market Insight, *supra.*

that restaurants: "[e]nsure all credit card data is encrypted. If you have older POS equipment that sends raw credit card data to a back-office server, it may be time to upgrade. Modern, secure POS systems encrypt credit card data as soon as a card is swiped, and they immediately send that data to the payment processor without temporarily storing data. Double-check your POS system to make sure it complies with PCI standards."[32]

73. Had Sonic employed certain best practices regarding encryption and tokenization of Payment Card Data at the POS terminal, it could have prevented the theft of Payment Card Data.

### 4. Sonic Failed to Install Software to Adequately Track and Monitor Its Network

74. Sonic failed to adequately track access to its network and to monitor the network for unusual activity, particularly with respect to its POS terminals, which would have allowed Sonic to detect and potentially prevent hackers from stealing Payment Card Data. One software vendor, Symantec, provides the following explanation regarding its endpoint protection software: "Symantec's network threat protection technology analyzes incoming data and blocks threats while they travel through the network before hitting endpoints. Rules-based firewall and browser protection are also included to protect against web-based attacks."[33]

75. Specifically, had Sonic implemented proper endpoint detection and prevention systems, it would have been able to identify suspicious activity occurring within its network.

---

[32] *6 measures to protect your network from hackers*, NAT'L REST. ASSOC., http://www.restaurant.org/Manage-My-Restaurant/Operations/Regulatory-back-office/4-measures-to-protect-your-network-from-hackers (last visited October 27, 2017).

[33] Data Sheet, Symantec Corporation, Symantec™ Endpoint Protection 12.1.6 (2015), https://www.symantec.com/content/dam/symantec/docs/data-sheets/endpoint-protection-en.pdf (last visited October 27, 2017).

Additionally, proper endpoint detection would have triggered warnings and alerted Sonic to the transmission of Payment Card Data within its systems and should have alerted Sonic to large volumes of data being removed, or exfiltrated, from its network.

76.     Of course, warnings and alerts are only valuable to the extent the IT department reviews the logs of those warnings and alerts.

### D. In Breaching Its Duty to Not Create Risk of Harm to Others, Sonic Chose Not to Follow Industry Standards of Care

77.     Sonic's adherence to reasonable industry standards of care would have either prevented or timely detected this Data Breach. In addition to the best practices discussed above, the payment card industry and federal agencies have issued recommended standards of care regarding adequate data security measures.

78.     Given the extensive network of financial institutions involved in payment card transactions and the sheer volume of daily transactions using credit and debit cards, it is unsurprising that financial institutions and credit card processing companies have issued rules and standards governing the basic measures that merchants must take to ensure consumers' valuable data is protected.

79.     The Payment Card Industry Security Standards Council promulgates minimum standards, which apply to all organizations that store, process, or transmit payment card data. These standards are known as the Payment Card Data Security Standard ("PCI DSS"). PCI DSS is the industry standard governing the security of payment card data, although it sets the minimum level of what must be done, not the maximum.[34]

---

[34] https://www.pcisecuritystandards.org/.

80. PCI DSS 3.1, the version of the standards in effect at the time of the data breach, imposed the following twelve "high-level" mandates:

| PCI Data Security Standard – High Level Overview | | |
|---|---|---|
| Build and Maintain a Secure Network and Systems | 1. | Install and maintain a firewall configuration to protect cardholder data |
| | 2. | Do not use vendor-supplied defaults for system passwords and other security parameters |
| Protect Cardholder Data | 3. | Protect stored cardholder data |
| | 4. | Encrypt transmission of cardholder data across open, public networks |
| Maintain a Vulnerability Management Program | 5. | Protect all systems against malware and regularly update anti-virus software or programs |
| | 6. | Develop and maintain secure systems and applications |
| Implement Strong Access Control Measures | 7. | Restrict access to cardholder data by business need to know |
| | 8. | Identify and authenticate access to system components |
| | 9. | Restrict physical access to cardholder data |
| Regularly Monitor and Test Networks | 10. | Track and monitor all access to network resources and cardholder data |
| | 11. | Regularly test security systems and processes |
| Maintain an Information Security Policy | 12. | Maintain a policy that addresses information security for all personnel |

PCI DSS 3.1, furthermore, set forth detailed and comprehensive requirements that had to be followed to meet each of the twelve mandates.[35]

81. Among other things, PCI DSS required Sonic to properly secure payment card data; not store cardholder data beyond the time necessary to authorize a transaction; maintain up-to-date antivirus software and a proper firewall; restrict access to payment card data to those with a need to know; establish a process to identify and timely fix security vulnerabilities; assign unique identification numbers to each individual with access to its systems; and encrypt payment card data at the POS.

82. Furthermore, PCI DSS 3.2 sets forth detailed and comprehensive requirements that must be followed to meet each of the 12 mandates.

---

[35] https://www.pcisecuritystandards.org/documents/PCIDSS_QRGv3_1.pdf.

83. Defendant was at all times fully aware of its data protection obligations for Sonic stores in light of its participation in the payment card processing networks and its daily collection and transmission of tens of thousands of sets of Payment Card Data.

84. Similarly, U.S. CERT, part of the Department of Homeland Security, issued Alert TA14-002A on January 2, 2014, titled "Malware Targeting Point of Sale Systems."[36] The document discusses hardware and software attacks against POS systems and includes specific best practices recommended to protect POS systems. *Id. See also* John H. Sawyer, *Tech Insight Defending Point-Of-Sale Systems*, InformationWeek (Jan. 24, 2014), https://www.darkreading.com/attacks-breaches/tech-insight-defending-point-of-sale-systems/d/d-id/1141214.

85. The Cybersecurity Framework developed by NIST, the federal agency that works with industry to develop and apply technology, measurements, and standards, also provides businesses with guidance on best practices. The Cybersecurity Framework cites numerous industry standards available to guide businesses in adopting best practices, including the Information Systems Audit and Control Association's ("ISACA") Control Objectives for Information and Related Technology ("COBIT"), the Council on CyberSecurity's Top 20 Critical Security Controls, the International Society of Automation's Standards (such as ANSI/ISA-62443-2-1 (99.02.01)-2009 and ANSI/ISA-62443-3-3 (99.03.03)-2013), and the International Organization for Standardization's ISO/IEC 27001:2013.[37]

---

[36] U.S. CERT, *Alert (TA14-002A)*, *supra* n.21.

[37] Framework for Improving Critical Infrastructure Cybersecurity, Version 1.0, National Institute of Standards and Technology, February 12, 2014, https://www.nist.gov/cyberframework.

86.     According to the *ISACA Journal*, the Enterprise Strategy Group found that 72 percent of North American organizations with 1,000 or more employees have implemented one or more formal IT best-practice control and process models and standards such as COBIT and ISO/IEC 27001 and 27002.[38]

87.     COBIT 5 provides management practices and monitoring processes to adequately protect organizations from internal and external data threats. *Id.* Specifically, COBIT 5 Management Practices recommend that organizations implement the following:

88.     The ISO and the International Electrotechnical Commission ("IEC") have likewise developed standards and models for establishing, implementing, operating, monitoring, reviewing, maintaining and improving information security management systems. ISO/IEC27001 sets forth a check list and control objectives for information security policies for organizations to protect their information systems and networks.[39]   Specifically, the control objectives include:

> **A.5.1 Information Security Policy:** Objective: to provide management direction and support for information security in accordance with business requirements and relevant laws and regulations.
>
> **A.6.1.1 Management Commitment to Information Security:** Control – Management shall actively support security within the organization through clear direction, demonstrated commitment, explicit assignment, and acknowledgment of information security responsibilities.

---

[38] Mathew Nicho, Ph.D., CEH, SAP-SA, RWSP, and Hussein Fakhry, Ph.D., *Using COBIT 5 for Data Breach Prevention*, ISACA Journal (2013), https://www.isaca.org/Journal/archives/2013/Volume-5/Pages/Using-COBIT-5-for-Data-Breach-Prevention.aspx#2 (last accessed October 29, 2017).

[39] ISO/IEC 27001 (2005), *available at* http://bcc.portal.gov.bd/sites/default/files/files/bcc.portal.gov.bd/page/adeaf3e5_cc55_4222_876 7_f26bcaec3f70/ISO_IEC_27001.pdf.

**A.10.3 System planning and acceptance:** Objective: To minimize the risk of systems failures. **A.10.3.2 System acceptance:** Control – Acceptance criteria for new information systems, upgrades, and new versions shall be established and suitable tests of the system(s) carried out during development and prior to acceptance.

**A.10.4 Protection against malicious and mobile code: O**bjective: To protect the integrity of software and information. **A.10.4.1 Controls against malicious code:** Control – Detection, prevention, and recovery controls to protect against malicious code and appropriate user awareness procedures shall be implemented.

**A.10.6 Network security management:** Objective: To ensure the protection of information in networks and the protection of the supporting infrastructure. **A.10.6.1 Network controls:** Control – Networks shall be adequately managed and controlled, in order to be protected from threats, and to maintain security for the systems and applications using the network, including information in transit.

**A.10.10 Monitoring:** Objective: To detect unauthorized information processing activities. **A.10.10.1 Audit logging:** Control – Audit logs recording user activities, exceptions, and information security events shall be produced and kept for an agreed period to assist in future investigations and access control monitoring.

**A.11.4 Network access control:** Objective: To prevent unauthorized access to networked services. **A.11.4.1 Policy on use of network services:** Control – Users shall only be provided with access to the services that they have been specifically authorized to use.

**A.11.4.7 Network routing control**: Control – Routing controls shall be implemented for networks to ensure that computer connections and information flows do not breach the access control policy of the business applications.

**A.12.4 Security of system files:** Objective: To ensure the security of system files.

**A.12.4.1 Control of operational software:** Control – There shall be procedures in place to control the installation of software on operational systems.

**A.13.1 Reporting information security events and weaknesses:** Objective: To ensure information security events and weaknesses associated with information systems are communicated in a manner allowing timely corrective action to be taken. **A.13.1.1 Reporting information security events:** Control – Information security events shall be reported through appropriate management channels as quickly as possible.

*Id.* at 13-26.

89.     Similarly, ISO/IEC 27002 provides additional, specific best practice

recommendations on information security management systems.[40] ISO 27002 states that in order to properly protect against malicious and mobile code and to protect the integrity of software and the organization's information, the following guidance should be observed:

> Implementation guidance: Protection against malicious code should be based on malicious code detection and repair software, security awareness, and appropriate system access and change management controls.

*Id.*

90.     Visa also frequently provides merchants with best practices tips. For example, in May 2009, Visa issued an updated Data Security Alert instructing merchants to secure their POS environments by, among other things, implementing egress and ingress filtering, network segmentation, firewalls, file integrity monitoring, updated antivirus software programs, and protocols for routine monitoring of computer systems.[41]

91.     Because Sonic stores accepted payment cards containing sensitive financial and personal information, Defendant knew that financial institutions, such as Plaintiff and the Class, were entitled to, and did, rely on Defendant to keep that sensitive information secure from would-be data thieves in accordance with at least the PCI DSS requirements. Sonic did not even meet this minimum standard of care, much less even attempt to comply with other well-known industry best practices.

### E.  Federal and State Statutes Create a Statutory Duty to Not Engage in Unfair Practices

#### 1.  The FTC Act and Similar State Statutes

---

[40] ISO/IEC 27002 (2005), *available at* http://www.slinfo.una.ac.cr/documentos/EIF402/ISO27001.pdf (last accessed October 29, 2017).

[41] Data Security Alert – *Targeted Hospitality Sector Vulnerabilities*, *supra* n.17.

92.     According to the Federal Trade Commission ("FTC"), the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data, such as Payment Card Data, constitutes an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act of 1914 ("FTC Act"), 15 U.S.C. § 45.[42]

93.     In 2007, the FTC published guidelines that establish reasonable data security practices for businesses. The guidelines note that businesses should a) protect the personal customer information that they keep; b) properly dispose of personal information that is no longer needed; c) encrypt information stored on computer networks; d) understand their networks' vulnerabilities; and e) implement policies for installing vendor-approved patches to correct security problems. The guidelines also recommend that businesses a) consider using an intrusion detection system to expose a breach as soon as it occurs; b) monitor all incoming traffic for activity indicating someone may be trying to hack the system; c) watch for large amounts of data being transmitted from the system; and d) have a response plan ready in the event of a breach.[43]

94.     The FTC also has published a document, entitled "Protecting Personal Information: A Guide for Business," which highlights the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.[44]

---

[42] Section 5 of 15 USC § 45 - https://www.law.cornell.edu/uscode/text/15/45

[43] http://www.faegrebd.com/ftc-releases-data-security-guide-for-businesses

[44] Federal Trade Commission, *Protecting Personal Information: A Guide for Business*(Nov. 2011), www.stopfraudcolorado.gov/sites/default/files/bus69-protecting-personal- information-guide-business_0.pdf.

95.     Another article "FTC Facts for Business" published by the FTC highlights the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.[45]

96.     The FTC also has issued numerous orders against businesses that failed to employ reasonable measures to secure Payment Card Data. These orders provide further guidance to businesses with regard to their data security obligations.

97.     In the years leading up to the Sonic data breach and during the course of the breach itself, Sonic failed to follow the guidelines recommended by the FTC.  Furthermore, by failing to have reasonable data security measures in place, Sonic engaged in an unfair act or practice within the meaning of Section 5 of the FTC Act.

98.     In addition, individual states have enacted statutes based upon the FTC Act that also create a statutory duty to not engage in unfair business practices. Specifically, the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*., Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*., Maine Unfair Trade Practices Act, 5 M.R.S.A §§ 205-A, *et seq*., Massachusetts Consumer Protection Act, Mass. Gen. Laws Ch. 93A, *et seq*., New Hampshire Consumer Protection Act, N.H. Stat. §§ 358-A:1, *et seq*., and Vermont Consumer Fraud Act, 9 V.S.A §§ 2451, *et seq*., prohibit unfair trade practices. Each statute is interpreted consistently with Section 5 of the FTC Act, with consideration given to the interpretation and construction given to Section 5 by the FTC and federal courts.

**2.  State Statutes Provide Guidance Regarding the Standard of Care Required**

---

[45] https://www.ftc.gov/system/files/documents/plain-language/bus69-protecting-personal-information-guide-business_0.pdf

32

to Protect Data

99.    Several state laws also provide guidance regarding the standard of care required to protect personal and financial information contained in the Payment Card Data that is acquired by and entrusted to businesses like Sonic.  *See* Ark. Code § 4-110-104(b); Cal. Civ. Code §§ 1798.81, 1798.81.5; Fla. Stat. § 501.171(2); and Mass. Gen. Laws Ch. 93H § 2(a). These statutes require businesses, like Sonic, to implement and maintain reasonable security procedures and practices to protect the personal and financial information, which is contained in Payment Card Data, to prevent unauthorized access, destruction, use, modification, or disclosure of the information.

100.    The FTC Act and its state law counterparts at a minimum provide a reasonable standard of care, if not a statutory duty, with which Sonic did not even attempt to comply.

**F.  The Property Damage and Financial Losses that Financial Institutions Have Suffered, and Will Continue to Suffer, Were Foreseeable**

101.    Processing a payment card transaction involves four major steps:

*Authorization* – when a customer presents a card to make a purchase, Sonic requests authorization of the transaction from the card's issuer using the Payment Card Data from the card presented;

*Clearance* – if the issuer authorizes the transaction, Sonic completes the sale to the customer and forwards a purchase receipt to the acquiring bank with which it has contracted;

*Settlement* – the acquiring bank pays Sonic for the purchase and forwards the receipt to the issuer, which then reimburses the acquiring bank; and

*Post-Settlement* – the issuer posts the charge to the customer's credit or debit account.

102.    Payment Card Data is central to the payment card transaction process. For financial institutions, like Plaintiff, Payment Card Data is an asset that has significant value.

Payment Card Data is owned by the financial institution, not the cardholder; the cardholder is merely an authorized user. Payment Card Data is kept by financial institutions in the form of computer data,[46] stored as records in a secured database on a financial institution's computer system.[47] In addition, the Payment Card Data is encoded on the magnetic stripe of the payment card. Payment Card Data is a financial institution's means of authenticating the cardholder and authorizing a payment card transaction.

103. To authorize a transaction, the issuing financial institution receives, from the merchant, the Payment Card Data that is encoded on the payment card being used by the consumer. The issuing financial institution's computer uses the Payment Card Data, received from the merchant, to locate the computer data on the financial institution's computer for the payment card's specific record. The financial institution then uses the payment card's specific record stored on its computer to authorize the transaction. The transaction authorization process relies on the Payment Card Data being known only to the parties to the payment card transaction.

104. When Payment Card Data (that is stored on financial institutions' computer systems and used to securely authorize financial transactions) is compromised, the computer

---

[46] Computer data is "any representation of knowledge, facts, concepts, instruction, or other information computed, classified, processed, transmitted, received, retrieved, originated, stored, manifested, measured, detected, recorded, reproduced, handled, or utilized by a computer, computer network, computer program, or computer software, and may be in any medium[.]" N.H. Rev. Stat. § 638:16, V.

[47] "Each row of a database comprises a single record made up of multiple distinct pieces of information, and each column of the database table represents an attribute of that record." A SANS Inst. Whitepaper- November 2007, REGULATIONS AND STANDARDS: WHERE ENCRYPTION APPLIES. For example, a record of protected stored Payment Card Data for the financial institutions will include, but not be limited to the following sensitive information: the cardholder name, address, primary account numbers, and associated financial information such as expiration date, daily limits, and service codes.

database record that contains the compromised Payment Card Data is no longer usable to securely authorize transactions. Due to the disclosure of the Payment Card Data to third parties, the computer data for the specific payment card becomes susceptible to fraud, and therefore, loses its integrity.

105.    "Integrity" is a fundamental attribute of computer data. *See*, *e.g.*, 44 U.S.C. § 3542(b)(1)(A) (defining integrity as an attribute of the federal government's information security policy). "Integrity generally refers to maintaining computer data in a protected state, unaltered by improper, unauthorized or subversive conduct or acts contrary to what the system owner or privilege grantor intended. Integrity concerns computer data stored, processed, or in transit. In the context of databases, integrity also regards metadata and the functions involved."[48]

106.    When a data breach occurs, the computer database record that contains the compromised Payment Card Data is damaged and no longer usable to authorize transactions. In other words, the financial institution can no longer count on the person using the information to be the cardholder and cannot rely on its computer data to securely authorize transactions. The Payment Card Data therefore effectively is rendered commercially worthless.

107.    Thus, when Payment Card Data has lost its integrity, the financial institution must issue a replacement payment card with new Payment Card Data to prevent fraud. As a result, the computer data (database record) that contains the compromised Payment Card Data must be replaced with new computer data (database record) that matches the newly issued Payment Card Data.

---

[48] Ioana & Lucian Vasiu, *Break on Through: An Analysis of Computer Damage Cases*, 14 U. PITT. J. TECH. L. & POL'Y 158 (2014).

108.   These actions are not optional for the financial institutions. For example, the Gramm-Leach-Bliley Act ("GLBA") mandates that financial institutions protect the security and confidentiality of consumer nonpublic personal information at all times. *See* 15 U.S.C.A. §§ 6801-6809.

109.   Federal and state laws recognize that computer data, like Payment Card Data,[49] is property[50] that suffers "damage" when it has lost its integrity and been rendered unusable. *See,*

---

[49] State laws recognize Payment Card Data as computer data. *See, e.g.*, Ark. Code Ann. § 5-41-102(7) (defining computerized "data" as "any representation of information, knowledge, a fact, concept, or an instruction that is being prepared or has been prepared and is intended to be processed or stored, is being processed or stored, or has been processed or stored in a computer, computer network, or computer system"); Ark. Code Ann. § 5-41-201(4) (defining "data" as "a representation of any form of information, knowledge, a fact, concept, or an instruction that is being prepared or has been formally prepared and is intended to be processed, is being processed, or has been processed in a system or network"); N.H. Rev. Stat. § 638:16, IV (defining "computer data" as "any representation of knowledge, facts, concepts, instruction, or other information computed, classified, processed, transmitted, received, retrieved, originated, stored, manifested, measured, detected, recorded, reproduced, handled, or utilized by a computer, computer network, computer program, or computer software, and may be in any medium, including, but not limited to, computer print-outs, microfilm, microfiche, magnetic storage media, optical storage media, punch paper tape, or punch cards, or it may be stored internally in read-only memory or random access memory of a computer or any other peripheral device").

[50] State laws recognize that "property" includes computerized data. *See, e.g.*, Ark. Code Ann. § 5-41-102(10) ("'Property' includes, but is not limited to, a financial instrument, data, computer program, document associated with a computer or computer program, or a copy of a financial instrument, data, computer program, or document associated with a computer or computer program, whether tangible or intangible, including both human and computer readabledata, and data while in transit"); Ark. Code Ann. § 5-41-201(10) (defining "property" as "anything of value and includes a financial instrument, information, electronically produced data, program, and any other tangible or intangible item of value"); N.H. Rev. Stat. § 638:16, XVI (defining "property" to include "computer data . . . regardless of whether [it is]: (1) Tangible or intangible; (2) In a format readable by humans or by a computer; (3) In transit between computers or within a computer network or between any devices which comprise a computer; or (4) Located on any paper or in any device on which it is stored by a computer or by a human"); C.R.S.A. § 18-5.5-101(8) ("'Property' includes, but is not limited to, financial instruments, information, including electronically produced data, and computer software and programs in either machine or human readable form, and any other tangible or intangible item of value").

*e.g.*, 18 U.S.C. §§ 1030(e)(8), (11) (defining "damage" as "any impairment to the integrity or availability of data, a program, a system, or information;" and, "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service"); C.R.S.A. § 18-5.5-101(6.3) ("'Damage' includes, but is not limited to, any impairment to the integrity of availability of information, data, computer program, computer software, or services on or via a computer, computer network, or computer system or part thereof."); *see also* Ark. Code Ann. §§ 5-41-101 (recognizing that the opportunities for "the alteration or destruction of computerized information or files, and the stealing of financial instruments, data, and other assets are great" and that "[l]osses from [such incidents] are potentially astronomical"); Ark. Code Ann. § 5-41-106 (providing a private right of action to recover for damage to computer data); Ark. Code Ann. § 5-41-202 (recognizing acts that harm computer data as unlawful); N.H. Rev. Stat. § 638:17, IV(b) (recognizing damage to computer data as a crime).

110.   In short, Payment Card Data kept as computer data is Plaintiff's and the Class's means of authenticating the cardholder and authorizing a transaction. When the Payment Card Data reflected in the computer data was compromised in the Data Breach, the computer data was damaged because it lost its integrity and Plaintiff and the Class no longer could rely on it to authorize transactions. In other words, Plaintiff and the Class no longer can count on the person using the information to be the cardholder and cannot rely on its computer data to securely authorize transactions. Therefore, Sonic, by implementing inadequate data security measures, caused Plaintiff and the Class to suffer property damage.

111. The property damage suffered by Plaintiff and the Class was foreseeable to Defendant. Defendant knew that implementing data security measures that were inadequate to protect Payment Card Data would cause harm to the card-issuing institutions, such as Plaintiff and the Class, because the issuers are financially responsible for fraudulent card activity, *see* 12 C.F.R. § 1005.6, 12 C.F.R. § 1026.12, and must incur significant costs to prevent additional fraud.

112. As the direct and proximate result of Sonic's conduct, Plaintiff has suffered and will continue to suffer irreparable injury and significant property damage and financial losses. Specifically, Plaintiff and other financial institutions have been forced to: (a) replace the computer data rendered useless by the Data Breach; (b) cancel or reissue any credit and debit cards affected by the Data Breach; (c) close any deposit, transaction, checking, or other accounts affected by the Data Breach, including, but not limited to, stopping payments or blocking transactions with respect to the accounts; (d) refund any cardholder for any unauthorized transaction relating to the Data Breach; (e) respond to a higher volume of cardholder complaints, confusion, and concern; and (f) increase fraud monitoring efforts. These costs and expenses will continue to accrue as additional fraud alerts and fraudulent charges are discovered and occur.

113. Moreover, Plaintiff's and the Class's business is reliant on their reputation and customer relationships and their ability to maintain and grow their customer base in a competitive market. By engaging and continuing to engage in the conduct and activities described herein, Sonic inevitably will be subject to a data breach again.

**G. Payment Card Data is Protectable Trade Secret Information that Sonic Has Misappropriated**

38

114.    Payment Card Data is protectable trade secret information under the DTSA, 18 U.S.C. §§ 1831, *et seq.* The definition of "trade secrets" under § 1839(3) of the DTSA, is broad and generally covers "all forms and types of" protected information, regardless of how it is stored.

115.    Financial institutions, like Plaintiff and the Class, devote substantial effort, resources, time and investment to develop, create, use and protect the confidence of Payment Card Data. The protected Payment Card Data resides on the financial institutions' secure servers, with limited access and significant security protections.

116.    Financial institutions, including Plaintiff, take reasonable steps to protect the secrecy of Payment Card Data as part of their ongoing standard operating procedures to maintain the confidential nature of this information.

117.    Financial institutions operate their business in interstate and foreign commerce, in that their payment card processing activities constitute the use of Payment Card Data in interstate and foreign commerce.

118.    As statutorily required,[51] financial institutions have numerous safeguards in place to maintain the confidentiality of Payment Card Data and to protect against its unlawful use or disclosure throughout the payment card process. There also are significant limits on a financial institution's disclosure of Payment Card Data to third parties. For example, a financial institution must not disclose an account number or similar form of access number or access code for a payment card, to any nonaffiliated third party (other than a consumer reporting agency) for use in

---

[51] *See, e.g.*, Fair Credit Reporting Act ("FCRA"), 15 U.S.C.A. §§ 1681, *et seq.*; Truth in Lending Act ("TILA"), 15 U.S.C.A. §§ 1601, *et seq.* and its implementing Regulation Z (12 C.F.R. Part 226); Equal Credit Opportunity Act, 15 U.S.C.A. §§ 1691, *et seq.* and its implementing Regulation B (12 C.F.R. Part 202); and GLBA, 15 U.S.C.A. §§ 6801, *et seq.*

telemarketing, direct mail marketing, or other marketing through electronic mail to the consumer. *See* 15 U.S.C.A. §§ 6801-6809.

119.    As part of the measures to protect confidentiality and prevent unauthorized disclosure, payment cards are issued to consumers in an "inactive" status and must be "activated" by the financial institutions' customer prior to use. The payment card can only be activated in the manner the financial institutions specify. Payment card activation steps include confirmation of consumer identity and verification of the payment card via telephone call or online. The activation requirement is a security measure financial institutions use to ensure that the rightful customer actually received the card. The activation measures also serve to protect the secrecy of Payment Card Data and to ensure the confidential information contained on the payment card does not end up disclosed to an unintended third party. Only after a payment card is activated, can the consumer use it to make purchases.

120.    In addition, the consumer must take steps to maintain the secrecy of the financial institutions' Payment Card Data. The FTC recommends that consumers keep payment cards in a safe place and use care in disclosure of the Payment Card Data.[52] Moreover, the consumers must notify the financial institution if the card is lost or stolen. *Id.*

121.    Regarding usage of a payment card, Payment Card Data from the card is obtained from the magnetic stripe and verified at the time of purchase. It is absolutely critical that the Payment Card Data stays only between the parties to the transaction (the consumer and its issuing bank and the merchant and its acquiring bank). The importance of allowing access only to those parties necessary is evidenced by a myriad of security rules and regulations, such as PCI

---

[52] How to Protect Your Cards and Account Information: For Credit and ATM or Debit Cards, https://www.consumer.ftc.gov/articles/0213-lost-or-stolen-credit-atm-and-debit-cards.

DSS, discussed above, and the Fair and Accurate Credit Transactions Act ("FACTA"), which prohibits a merchant from printing more than the last five digits of the payment card number or the expiration date on a receipt.

122.    Financial institutions derive independent economic value from Payment Card Data not being generally known or readily ascertainable through proper means. Indeed, once Payment Card Data becomes known to unauthorized third parties, it is rendered useless for its intended purpose and must be replaced by the financial institutions.

123.    As outlined above, Sonic's business operations and payment systems are governed by PCI DSS, which gives rise to a duty to protect and maintain the secrecy of Plaintiff's and the Class's Payment Card Data. Sonic knew that Payment Card Data was highly sensitive, protected information and still failed to reasonably maintain the requisite secrecy of Plaintiff's and the Class's Payment Card Data.

124.    Sonic misappropriated Plaintiff's and the Class's Payment Card Data by its unauthorized disclosure. Under the DTSA, the term "misappropriation" is defined broadly and includes improper use or disclosure. Sonic misappropriated financial institutions' confidential, proprietary, and trade secret information through its disclosure of Payment Card Data, as described herein, without the express or implied consent of Plaintiff and the Class, where Sonic at the time of disclosure knew or had reason to know that it had acquired Payment Card Data under circumstances giving rise to a duty to maintain the secrecy of the Payment Card Data. *See* 18 U.S.C. § 1839(5)(B)(ii)(II).

## V.    CLASS ACTION ALLEGATIONS

125.    Plaintiff brings Counts One-Three and Five below individually and on behalf of

all other financial institutions similarly situated pursuant to Fed. R. Civ. P. 23. The proposed

Class is defined as:

> All Financial Institutions − including, but not limited to, banks and credit unions − in the United States (including its Territories and the District of Columbia) that issue payment cards, including credit and debit cards, or perform, facilitate, or support card-issuing services, whose customers made purchases from Sonic stores from January 1, 2017 through December 31, 2017 to the present (the "Class").

126.     Plaintiff also brings Count Four below individually and on behalf of those defined

below within the identified state pursuant to Fed. R. Civ. P. 23. The proposed statewide Class is

defined as:

> All Financial Institutions − including, but not limited to, banks and credit unions − that either: (a) are located in Arkansas that issue payment cards, including credit and debit cards, or perform, facilitate, or support card-issuing services, whose customers made purchases from Sonic stores from January 1, 2017 through December 31, 2017 to the present (the "Class"), or (b) have customers located in Arkansas that were issued payment cards used at Sonic stores from January 1, 2017 through December 31, 2017 to the present (the "Arkansas Class").

127.     Excluded from each Class are Defendant and its subsidiaries, franchises, and

affiliates; all employees of Defendant; all persons who make a timely election to be excluded

from the Class and/or the Arkansas Class; government entities; and the judge to whom this case

is assigned, including his/her immediate family and court staff.

128.     **Numerosity**: All requirements of Fed. R. Civ. P. 23(a)(1) are satisfied. The

members of the Class are so numerous and geographically dispersed that individual joinder of all

Class members is impracticable. While Plaintiff is informed and believes that there are

thousands of members of the Class, the precise number of Class members is unknown to

Plaintiff. Class members may be identified through objective means. Class members may be

notified of the pendency of this action by recognized, Court-approved notice dissemination

methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

129. **Commonality and Predominance**: All requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3)'s predominance requirement are satisfied. This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

    a. whether Sonic engaged in the misconduct alleged;

    b. whether Sonic implemented data security measures that were inadequate to detect and potentially prevent the Data Breach and protect Payment Card Data;

    c. whether Sonic owed a duty to Plaintiff and the Class members and whether Sonic violated that duty;

    d. whether Sonic engaged in unfair or unlawful acts and practices in violation of consumer protection statutes;

    e. whether Plaintiff's and the Class's Payment Card Data constitutes protectable trade secrets that Sonic misappropriated;

    f. whether Plaintiff and Class members were injured and suffered damages or other ascertainable loss as a result of Sonic's conduct; and

    g. whether Plaintiff and the Class members are entitled to relief and the measure of such relief.

130. **Typicality**: All requirements of Fed. R. Civ. P. 23(a)(3) are satisfied. Each Plaintiff is a member of the Class, having issued payment cards that were compromised in the

Sonic Data Breach. Plaintiff's claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Defendant's conduct and Plaintiff and the Class are asserting claims based on the same legal theories.

131. **Adequacy**: All requirements of Fed. R. Civ. P. 23(a)(4) are satisfied. Plaintiff is an adequate Class representative because it is a member of the Class and its interests do not conflict with the interests of the other members of the Class that it seeks to represent. Plaintiff is committed to pursuing this matter for the Class with the Class's collective best interests in mind. Plaintiff has retained counsel competent and experienced in complex class action litigation of this type, and Plaintiff intends to prosecute this action vigorously. Plaintiff and its counsel will fairly and adequately protect the Class's interests.

132. **Superiority**: The superiority requirement of Fed. R. Civ. P. 23(b)(3) is satisfied. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Sonic, so it would be impracticable for members of the Class to individually seek redress for Sonic's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

133.    **Injunctive and Declaratory Relief**: All requirements of Fed. R. Civ. P. 23(b)(2) are satisfied.   Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole.

## VI.    CAUSES OF ACTION

### COUNT I
### Negligence

134.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

135.    Sonic owed—and continues to owe—a duty to Plaintiff and the Class to use and exercise reasonable care in obtaining and processing Plaintiff and the Class's Payment Card Data.  This duty arises from the common law and statute and is independent of any duty Sonic owed as a result of its contractual obligations.

136.    Sonic has an independent common law duty of reasonable care to prevent the foreseeable risk of harm to others, including Plaintiff and the Class.  It was entirely foreseeable to Sonic that injury would result from the use of inadequate and unreasonable data security measures to protect Payment Card Data. It was also foreseeable that, if reasonable security measures were not taken, hackers would steal Plaintiff and the Class's Payment Card Data; thieves would use Payment Card Data to make large numbers of fraudulent transactions; and, as a result, Plaintiff and the Class would be required to replace the computer data rendered useless by the Data Breach, cancel and reissue the compromised payment cards, and reimburse their customers for any unauthorized transactions relating to the Data Breach.

137.    Plaintiff and the Class thus seek to recover for Sonic's breach of an independent

duty to not create unreasonable risk with regard to Plaintiff and the Class's Payment Card Data. Sonic had a duty to employ reasonable data security measures because inadequate measures foreseeably create an unreasonable risk that Plaintiff and the Class's Payment Card Data would be compromised, with substantial property damage and financial loss resulting. In failing to maintain reasonable security measures, Sonic created the risk of the harm that occurred and Plaintiff and the Class were the foreseeable victims of the harm.

138.    Defendant knew or should have known of the risk that its POS system could be infiltrated using methods similar or identical to those previously used against major retailers in recent months and years.

139.    Defendant knew or should have known that its implementation of inadequate and unreasonable data security measures to protect its POS terminals against obvious risks would result in harm to Plaintiff and the Class.

140.    By accepting payment cards, Sonic also voluntarily assumed the duty to use reasonable security measures. When a company, such as Sonic, through the ordinary course of its business (and for its own economic benefit) receives, gathers, and/or stores Payment Card Data, it has undertaken to render services necessary for the protection of that property, and therefore has an affirmative duty to take reasonable efforts to provide security for that property.

141.    A duty to use reasonable security measures also arose as a result of the special relationship that existed between Sonic and Plaintiff and the Class.    The special relationship arose because financial institutions entrusted Sonic with Payment Card Data from payment cards they issued.  Only Sonic was in a position to ensure that its systems were sufficient to protect against the harm to financial institutions from a data breach.

142.    Sonic's duty to use reasonable data security measures also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which imposes a statutory duty on merchants to not engage in unfair business practices, which the FTC repeatedly has determined includes the duty to use reasonable data security measures.  In addition, individual states have enacted statutes based on the FTC Act, as alleged herein, that also create a statutory duty to not engage in unfair business practices.

143.    Sonic breached its common law and statutory duties, and thus was negligent, by failing to use reasonable measures to protect its customers' personal and financial information from the hackers who perpetrated the data breach.  Upon information and belief, the specific negligent acts and omissions committed by Sonic include, but are not limited to, some or all of the following:

    a.  failure to employ systems to protect against malware;

    b.  failure to regularly update its antivirus software;

    c.  failure to maintain an adequate firewall

    d.  failure to track and monitor access to its network and cardholder data;

    e.  failure to limit access to those with a valid purpose;

    f.  failure to encrypt PII at the point-of-sale;

    g.  failure to transition to the use of adequate EMV technology;

    h.  failure to conduct frequent audit log reviews and vulnerability scans and remedy problems that were found;

    i.  failure to assign a unique ID to each individual with access to its systems;

    j.  failure to automate the assessment of technical controls and security

configuration standards;

k.  failure to adequately staff and fund its data security operation;

l.  failure to use due care in hiring, promoting, and supervising those responsible for its data security operations;

m.  failure to recognize red flags signaling that Sonic's systems were inadequate and that as a result the potential for a massive data breach was increasingly likely;

n.  failure to recognize that hackers were stealing Payment Card Data from its network while the data breach was taking place;

o.  failure to contain the data breach or otherwise revoke hackers' access in a timely manner.

144.  As a direct and proximate result of Sonic's negligence, Plaintiff and the Class have suffered and continue to suffer substantial property damage and financial losses as detailed herein.

**COUNT II**
**Negligence *Per Se***

145.  Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

146.  Section 5 of the FTC Act prohibits "unfair…practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Sonic, of failing to use reasonable measures to protect Payment Card Data.  The FTC publications and orders described above also form part of the basis of Sonic's duty.

147.  Sonic violated Section 5 of the FTC Act (and similar state statutes) by implementing unreasonable data security measures that were inadequate to protect Payment Card

48

Sonic's conduct was particularly unreasonable given the nature and amount of Payment Card Data it obtained and stored and the foreseeable consequences of a data breach, including specifically, the immense damages that would result to consumers and financial institutions.

148.    Sonic's violation of Section 5 of the FTC Act (and similar state statutes) constitutes negligence *per se.*

149.    Plaintiff and members of the Class are within the class of persons that Section 5 of the FTC Act (and similar state statutes) was intended to protect, as they are engaged in trade and commerce and bear primary responsibility for directly reimbursing consumers for fraud losses and maintaining the confidentiality of Payment Card Data. Moreover, both Plaintiff and many Class Members are credit unions, which are organized as cooperatives whose members are consumers.

150.    The harm that has occurred is the type of harm the FTC Act (and similar state statutes) was intended to guard against.  Indeed, the FTC has pursued over 50 enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and the Class.

151.    As a direct and proximate result of Sonic's negligence *per se*, Plaintiff and the Class have suffered, and continue to suffer, substantial property damage and financial losses as detailed herein.

## COUNT III
### Misappropriation of Trade Secrets (18 U.S.C. §§ 1831, *et seq.*)

152.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

153.    Plaintiff's and the Class's customers utilize the financial institutions' payment cards to engage in interstate and foreign commerce.

154.    Plaintiff and the Class's Payment Card Data qualifies as "trade secrets" under the DTSA, which covers "all forms and types of" protected information, regardless of how it is stored.  18 U.S.C. § 1839(3).

155.    Plaintiff and the Class obtain economic value from Payment Card Data not being generally known or readily ascertainable through proper means.

156.    Plaintiff and the Class have taken reasonable steps and precautions to safeguard Payment Card Data and to limit and restrict others from knowing, readily ascertaining or using Payment Card Data, as described herein.

157.    Sonic knew it had a duty to maintain the secrecy of Plaintiff and the Class's trade-secret-protected Payment Card Data due, in part, to PCI DSS Standards.

158.    Sonic has misappropriated through unauthorized disclosure Plaintiff and the Class's confidential, proprietary, and trade-secret-protected Payment Card Data.

159.    As a result of Sonic's improper misappropriation through unauthorized disclosure of Plaintiff and the Class's trade secrets, it has violated the DTSA.

160.    Plaintiff and the Class's business is reliant on their reputation and customer relationships and their ability to maintain and grow their customer base in a competitive market. As a direct and proximate result of Sonic's conduct, Plaintiff has suffered and, if Sonic is not enjoined, will continue to suffer irreparable injury and significant damages in an amount to be proven at trial.

161.    By engaging and continuing to engage in the conduct and activities described

herein, Sonic has disclosed and will inevitably disclose again protected Payment Card Data of Plaintiff and the Class. If Sonic's conduct is not remedied and if Sonic is not enjoined, Sonic will continue to misappropriate through unauthorized disclosure Plaintiff and the Class's Payment Card Data to their detriment.

162.    Sonic's actual and threatened misappropriation of Payment Card Data is causing Plaintiff and the Class to suffer irreparable harm, including but not limited to loss of customers, loss of reputation and customer goodwill, and loss of its investment in its trade secrets. This harm cannot be adequately remedied at law and requires permanent injunctive relief.

163.    Because Plaintiff and the Class's damages cannot be adequately compensated through remedies at law alone, Plaintiff and the Class seek permanent injunctive relief to recover and protect their Payment Card Data and other legitimate business interests. Plaintiff and the Class will continue to suffer irreparable harm absent injunctive relief from this Court.

164.    Sonic's actions in misappropriating Plaintiff and the Class's Payment Card Data were willful, wanton and malicious, and were taken with reckless disregard for the rights of Plaintiff and the Class.

165.    Plaintiff and the Class are entitled to full compensatory, exemplary, and consequential damages, as well as full attorneys' fees, costs and expenses.

### COUNT IV

### Violation of the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. §§4-88-101, *et seq.*

### (On Behalf of Plaintiff Alcoa and the Arkansas Class)

166.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

167.    Plaintiff Alcoa brings this claim on behalf of itself and the Arkansas Class pursuant to the Arkansas Deceptive Trade Practices Act ("ADTPA"), Ark. Code Ann. §§4-88-101, *et seq*.

168.    Plaintiff Alcoa and the Arkansas Class are "persons" within the meaning of the ADTPA. Ark. Code Ann. § 4-88-102(5).

169.    Plaintiff has suffered an "actual financial loss" as it has lost "an ascertainable amount of money" as a result of Sonic's unconscionable acts and practices. Ark. Code Ann. § 4-88-102(9).

170.    The ADTPA prohibits unconscionable acts or practices in business, commerce, or trade. Ark. Code Ann. § 4-88-107(10).

171.    Sonic engaged in unconscionable acts and practices in business, commerce, or trade under AFTPA by unreasonably adopting and maintaining data security measures that were inadequate to protect Payment Card Data and prevent the Data Breach. These unconscionable practices occurred repeatedly in connection with Sonic's trade or business.

172.    Sonic's affirmative acts in adopting and maintaining inadequate security measures are unconscionable within the meaning of ADTPA because they constituted immoral, unethical, oppressive, and unscrupulous activity, caused substantial injury to consumers and businesses, and provided no benefit to consumers or competition.

173.    Sonic's failure also was unconscionable within the meaning of ADTPA because its conduct undermined Arkansas public policy that businesses protect personal and financial information, as reflected in Ark. Code Ann. § 4-110-102.

174.    Plaintiff Alcoa and the Arkansas Class reasonably expected Sonic to maintain

secure networks, adhere to industry standards, and otherwise use reasonable care to protect Payment Card Data, which contains their cardholders' personal and financial information.

175.    Sonic has engaged in unconscionable consumer-oriented acts or practices and has injured Plaintiff Alcoa and the Arkansas Class by such acts and practices. While Sonic cuts corners and minimized costs, its competitors spent the time and money necessary to ensure private information was appropriately secured and safeguarded. Further, the injuries suffered by Plaintiff Alcoa and the Arkansas Class are not outweighed by any countervailing benefits to consumers or competition. And, because Sonic is solely responsible for securing its networks and protecting Payment Card Data, there is no way Plaintiff Alcoa and the Arkansas Class could have known about Sonic's inadequate data security practices or avoided the injuries they sustained. There were reasonable available alternatives to further Sonic's legitimate business interests, other than its conduct responsible for the Data Breach.

176.    Plaintiff Alcoa and the Arkansas Class have members located in Arkansas who used Plaintiff's and the Class's payment cards to purchase food for personal consumption from Sonic and whose payment cards were impacted by the Data Breach. For these Arkansas-based cardholders, Plaintiff Alcoa and the Arkansas Class reimbursed them for fraudulent transactions and/or reissued payment cards impacted by the Data Breach. Through these acts, Plaintiff Alcoa and the Arkansas Class suffered concrete and substantial injuries in Arkansas.

177.    Sonic willfully engaged in the unconscionable acts and practices described above and knew or should have known that those acts and practices were unfair in violation of the ADTPA.

178.    As a direct and proximate result of Sonic's unconscionable practices and violation

of ADTPA, Plaintiff Alcoa and the Arkansas Class have suffered and will continue to suffer substantial injury and ascertainable loss and are entitled to equitable and such other relief as this Court considers necessary and proper.

## COUNT V
## Declaratory and Injunctive Relief

179.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

180.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief.  Furthermore, the Court has broad authority to restrain acts, such as here, which are tortious and which violate the terms of the federal and state statutes described herein.

181.    An actual controversy has arisen in the wake of Sonic's data breach regarding its common law and other duties to reasonably safeguard Payment Card Data.  Plaintiff alleges that Sonic's data security measures were inadequate and remain inadequate.  Sonic likely will deny these allegations.  Furthermore, Plaintiff and the Class continue to suffer injury as additional fraudulent charges are being made on payment cards issued to Sonic's customers.

182.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.   Sonic continues to owe a legal duty to secure Payment Card Data;

b.   Sonic continues to breach this legal duty by employing inadequate and unreasonable measures to secure Payment Card Data; and

c.   Sonic's ongoing breaches of its legal duty continue to cause harm to Plaintiff and the Class.

183.   The Court also should issue corresponding injunctive relief requiring Sonic to employ adequate security protocols consistent with industry standards to protect Plaintiff's and the Class's Payment Card Data.  Specifically, this injunction should, among other things, direct Sonic to:

   a.  utilize industry standard encryption to encrypt the transmission of cardholder data at the point-of-sale and at all other times;

   b.  implement encryption keys in accordance with industry standards;

   c.  implement adequate EMV technology;

   d.  engage third party auditors, consistent with industry standards, to test its systems for weakness and upgrade any such weakness found;

   e.  audit, test, and train its data security personnel regarding any new or modified procedures and how to respond to a data breach;

   f.  regularly test its systems for security vulnerabilities, consistent with industry standards;

   g.  comply with all PCI DSS standards pertaining to the security of its customers' personal and confidential information;

   h.  utilize up-to-date POS hardware and software; and

   i.  install all upgrades recommended by manufacturers of security software and firewalls used by Sonic.

184.   If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the vent of another data breach at Sonic.  The risk of another such breach is real, immediate, and substantial. If another breach at Sonic occurs,

Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and it will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages, while warranted to compensate Plaintiff and the Class for out-of-pocket damages that are legally quantifiable and provable, do not cover the full extent of injuries suffered by Plaintiff and the Class, which include monetary damages that re not legally quantifiable or provable, and reputational damage.

185.    The hardship to Plaintiff and the Class, if an injunction is not issued, exceeds the hardship to Sonic if an injunction is issued. Among other things, if another data breach occurs at Sonic, Plaintiff and the Class Members will likely incur additional and significant damages.  On the other hand, the cost to Sonic of complying with an injunction, by employing reasonable data security measures, is relatively minimal, and Sonic has a pre-existing legal obligation to employ such measures.

186.    Issuance of the requested injunction will not disserve the public interest.  To the contrary, such an injunction would benefit the public by preventing another data breach at Sonic, thus eliminating the injuries that would result to Plaintiff and the Class whose Payment Card Data would be compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests that the Court:

A.    Certify the Class and appoint Plaintiff and Plaintiff's counsel to represent the Class;

B.    Enter a money judgment in favor of Plaintiff and members of the Class to

56

compensate them for the injuries suffered together with pre-judgment and post-judgment interest and treble damages and penalties where appropriate;

      C.      Enter a declaratory judgment in favor of Plaintiff and the Class as described above;

      D.      Grant Plaintiff the injunctive relief requested;

      E.      Award Plaintiff and the Class reasonable attorneys' fees and costs of suit; and

      F.      Award such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of any and all issues in this action so triable.

DATED: October 16, 2018               Respectfully submitted,

                                  **ROBERTS LAW FIRM, P.A.**

                                  Michael L. Roberts, AR Bar No. 90125
                                  Karen S. Halbert, AR Bar No. 2001019
                                  Stephanie Egner Smith, AR Bar No. 2004119
                                  20 Rahling Circle
                                  PO Box 241790
                                  Little Rock, AR 72223-1790
                                  Telephone: 501-821-5575
                                  Facsimile: 501-821-4474
                                  mikeroberts@robertslawfirm.us
                                  karenhalbert@robertslawfirm.us
                                  stephaniesmith@robertslawfirm.us

                                  *Counsel for Plaintiff and the Proposed Class*